## Case No. 5,558.

### GOODYEAR v. BISHOP et al.

[4 Blatchf. 438; 2 Fish. Pat. Cas. 96.] [1]

Circuit Court, S. D. New York. Aug. 17, 1860.

PATENTS—INFRINGEMENT — SUIT FOR BENEFIT OF EXCLUSIVE LICENSEE—INDEMNITY AGAINST COSTS—NOMINAL PLAINTIFF.

1. Where an action at law for the infringement of letters patent is brought in the name of the holder of the legal title to the patent, but for the benefit or a party who is an exclusive licensee, under the patent, of the right to make a particular article, the suit will not be discontinued on the application of the defendant and the consent of the nominal plaintiff.

[Cited in Nelson v. McMann, Case No. 10,109; Brush-Swan Electric Light Co. v. Thomson-Houston Electric Co., 48 Fed. 226; Brush Electric Co. v. Electric Imp. Co. of San José, 49 Fed. 74; Same v. California Electric Light Co., 3 C. C. A. 368, 52 Fed. 961.]
[Cited in Jackson v. Allen, 120 Mass. 77.]

2. The nominal plaintiff may claim indemnity against costs, and the court, on a proper application, will provide for it.

This was a motion by the defendants [James Bishop and others], founded on the consent of the nominal plaintiff [Charles Goodyear], to have an order entered discontinuing this suit, which was an action at law for the infringement of letters patent [No. 3,633] granted to the plaintiff [June 15, 1844, and reissued (No. 156), December 25, 1849], for improvements in the manufacture of India-rubber.

George C. Goddard, Francis B. Cutting, and William Curtis Noyes, for plaintiff.

James T. Brady and George Gifford, for defendants.

---

## Case No. 5,559.

### GOODYEAR et al. v. BISHOP et al.

[2 Fish. Pat. Cas. 154.] [1]

Circuit Court, S. D. New York. Jan., 1861.

PATENTS—INFRINGEMENT—DAMAGES—LICENSE RATE.

1. In order to find actual damages, the jury must find, in the evidence, the facts or data from which such actual damages are to be deduced.

2. If the patentee of a machine or other article uniformly sells a license to make or use the thing patented at a given rate, such license fee would constitute the actual damage of the patentee in an action for infringement.

[Cited in Emerson v. Simm, Case No. 4,443; Goodyear Dental Vulcanite Co. v. Van Antwerp, Id. 5,600.]

3. But if there is no such fixed and uniform fee, it is proper for the jury to inquire how many customers were diverted from the plaintiff to the defendant; whether the plaintiff was prepared to supply the market, and was prevented by the defendant; in short, whether, by the competition of the defendant, the plaintiff was limited, hindered, checked, or interfered with in his business, or otherwise actually damaged, in a sum equal to the profits which he could have made if he had made and sold the goods made and sold by the defendant, over and above what he (the plaintiff) did in fact make and sell.

4. In answer to the claim of the defendant, that he has made but a small sum, it is proper to consider that the whole expense of commencing and closing out the business is included in the time covered by the suit, and that such expenses are not properly chargeable to the patent.

This was an action on the case tried before Judge SHIPMAN and a jury, to recover damages for the infringement of letters patent [No. 3,633] granted to Charles Goodyear June 15, 1844, and reissued [No. 156] December 25, 1849, for "improvement in processes for the manufacture of India rubber." So much of this invention as covered the right to manufacture wearing apparel for men and boys, of rubber cloth, was conveyed, by license, to Jonathan Trotter for $10,000,

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and by Samuel S. Fisher, Esq., and here compiled and reprinted by permission.]

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

and a royalty of five cents per square yard. Trotter transferred this license to the Union Rubber Company, the parties in interest,—see Goodyear v. Bishop [Case No. 5,558],—for $25,000. In February, 1853, the defendants who had been connected with the Union Rubber Company as stockholders or otherwise, began the manufacture of articles covered by the license, and continued such manufacture for five months. The plaintiffs [Charles Goodyear, executor, and others] insisted that, if they had made the goods manufactured by defendants, they would have made a profit of nearly $30,000, and this was claimed as their measure of damages. The defendants [James Bishop, Galvin F. Spear, Nicholas Williamson, and James B. Laing] insisted that, although the nominal profits appeared to be large, yet that, in fact, they had netted only $473, and could only be liable, at most, for that sum. Infringement was not denied.

G. C. Goddard, F. B. Cutting, and W. Curtis Noyes, for plaintiffs.

J. C. T. Smidt, James T. Brady, and George Gifford, for defendants.

SHIPMAN, District Judge (charging jury). This action is brought to recover damages for the infringement by the defendants of the rights of the plaintiffs, alleged to be secured to them by an exclusive license from Goodyear, the patentee, to manufacture clothing or wearing apparel for men and boys, under what is known as the Goodyear patent.

The commencement of these acts of infringement may be safely assumed, on the evidence, to have been on February 1, 1853, and the manufacture of the articles in some stages was continued until July 1, 1853, a period of five months.

The premises on which this manufacture was carried on were situated in Naugatuck, Connecticut, and were hired by the defendants, who did business under the name and style of the "National Rubber Company." The lessees of the defendants were the Naugatuck Company. On May 22, 1853, the Naugatuck Company, the original lessees of the defendants, conveyed their interest in the premises to the plaintiffs, subject, of course, to the rights of the defendants under their lease. On the last named day the plaintiffs took forcible possession of the premises, and, in the eye of the law, illegally ejected the defendants therefrom. For this forcible dispossession of the defendants the plaintiffs were liable to an action, and the defendants had a right, under the law, to be restored to the peaceable occupancy of the premises.

Although the plaintiffs had thus obtained possession of the factory, the property of the defendants was not removed from it, and, after the interruption of the business of the defendants for some day or two, both parties came to an understanding that the defendants should be permitted to remain until the 1st of July, when the latter were to surrender and vacate the premises.

At this point the defendants make an important claim, and insist to you, as matter of fact, that this understanding or agreement, which was then entered into, had a wider scope than merely to permit the defendants to continue to occupy the factory until the 1st of July—that it, in point of fact, authorized the defendants to do all the acts which they did after the 22d of May, for which the plaintiffs are now seeking to recover damages.

The defendants still further claim that this understanding not only authorized them to continue their manufacture so far as they did continue it from the 22d of May down to the 1st of July, but that it also discharged them from all claims of the plaintiffs for what they had manufactured prior to that time.

It would follow, if this claim of the defendants were sustained by the evidence to your satisfaction, that the plaintiffs could not recover in this action, for, in that case, all the acts complained of in the plaintiffs' declaration, after the 22d of May, must have been done under the license of the plaintiffs, and all those before that time have been legally discharged.

On this point, gentlemen, under the instructions I shall submit to you, you will have no trouble. As I view the case, the only evidence for you to consider as to what this arrangement between the parties was, is to be found in the written memorandum signed by C. F. Spear and Williamson, two of the defendants, and dated the 25th day of May. The duty of construing this paper devolves on the court, and I charge you that it furnishes no discharge for the acts of the defendants prior to the 22d of May, and no excuse for their acts after that time, except what relate to their occupancy of the premises, and which the plaintiffs do not complain of. The whole question of damages, therefore, lies open for the entire time.

There is another question of fact which the counsel for the defendants urged upon your notice, but upon which my instructions will also relieve you from any responsibility.

The plaintiffs, as you will recollect, hold their title to the exclusive right to manufacture the articles in question under a license from Charles Goodyear.

The license came through Mr. Trotter, but that makes no difference. It is claimed that, by the terms of this license, Goodyear was bound to protect the plaintiffs against all infringements, including these wrongful acts of the defendants; that, in consequence of these infringements of the defendants, the plaintiffs withheld from Goodyear a large amount of tariffs which the plaintiffs would otherwise have been bound to pay to him for their right to manufacture under the li-

cense, and that this amount so withheld from Goodyear was ultimately applied in extinguishment or satisfaction of the very damages the plaintiffs are seeking to recover in this action.

On this point, the defendants insist that it appears from the testimony of Henry B. Goodyear that some $75,000 were thus withheld by the plaintiffs, although I do not recollect that he states that it was ever applied in satisfaction of the damages claimed in this suit.

But it appears, from other evidence in this case, that Charles Goodyear, the patentee, assigned all his interest in these tariffs to William Judson, and that, by virtue of that assignment and the powers conferred upon him by Goodyear, he had authority to settle with the Union Rubber Company (the plaintiffs) and adjust the matter in controversy between them and Goodyear.

The plaintiffs aver that Judson did settle with them, and adjust their differences with Goodyear; but that their claim against these defendants for damages for infringing the rights secured to them by their license, and which they are now seeking to recover, formed no part of that settlement. In proof of this they have offered in evidence the written agreement executed by Judson and themselves on February 25, 1858. It is the duty of the court to construe this instrument, and I charge you that it contains no evidence of any release by or payment to the plaintiffs of the damages resulting from the acts of the defendants complained of.

There is no other evidence in this case from which you can find such release or payment, unless it is to be found in the testimony of Mr. Henry B. Goodyear.

It follows, gentlemen, from the remarks I have already made, and from my views of the other legal questions in the case, that the plaintiffs are entitled to recover.

This brings us to a most important question, that of the amount of damages to which the plaintiffs are entitled; and here the duty rests mainly on you, and it is the most important part of the case.

The court can only submit to you the rule which you are to apply to the case, and some suggestions which may possibly aid you in its application. As to the rule, it will be your duty to give the plaintiffs such actual damages as they have proved to your satisfaction they have sustained at the hands of the defendants. And by actual damages I mean damages in fact, and not what is sometimes called in the law vindictive and exemplary damages. Sometimes a wrong or injury is done by a defendant under circumstances of wantonness or malice, and the law in such cases permits the jury to award to the plaintiff a sum over and above the pecuniary injury which he has received, and this additional amount is termed vindictive, or exemplary damages. But that rule has no application to the present case.

You are then to give the actual damages which the plaintiffs have proved that they suffered.

Your difficulty in this case will be to determine from the proof what amount of actual damages the plaintiffs have suffered.

If you could adopt the simple theory of the defendants' counsel, which is to give the amount the defendants actually netted, which one witness stated was $473, your task would be easy. That sum, with interest at six per cent. from January 1, 1854, to to-day, would fix the amount of your verdict. So, too, if you could adopt the equally simple theory of the plaintiffs' counsel, which is, to take the sum which the plaintiffs' witnesses say they (the plaintiffs) could have realized in profit if they had made and sold the articles made and sold by the defendants. This sum they claim is about $27,000, which, with the interest at six per cent., would yield about the sum of $40,000. Both these positions show how easy it is to theorize, for they are very easy and simple; but their strikingly diverse results show us also that, in the practical business of doing justice between man and man, mere theories require to be applied, if applied at all, with some degree of caution, and with some scrutiny to see if the facts presented by the evidence support them. Now, gentlemen, I do not say to you that $27,000 was not the actual damages suffered by the plaintiffs. But I do charge you that although the plaintiffs might have made $27,000 profits if they had made and sold these goods which the defendants manufactured and sold, that is by no means conclusive evidence that $27,000 is the actual damages they are entitled to recover.

It is for you to say whether, from the evidence before you, you are satisfied that the plaintiffs would have made these goods and realized these large profits if the defendants had not made them, and that the defendants by their acts deprived them of what they would otherwise have gained. You are to examine the evidence, and say whether there is sufficient proof to satisfy you that any and how many customers were diverted from the plaintiffs to the defendants; whether the plaintiffs were prepared to supply, and were prevented from supplying the articles made by the defendants; in short, whether, by the competition of the defendants, the plaintiffs were limited, hindered, checked, or interfered with in their business, or otherwise actually damaged in this sum, equal to the profits which they could have made if they had made and sold the same goods made and sold by the defendants over and above what they (the plaintiffs) did in fact make and sell.

If you are satisfied that the plaintiffs were thus actually damaged, then you will find your verdict accordingly; but, before you come to such a result, you must find in the evidence the facts or data from which you deduce that result.

If the jury should come to the conclusion that the evidence warrants them in finding the actual damages to be what this theory of the plaintiffs would indicate, they will, of course, from the selling price, $107,520, deduct the costs of manufacture (including the tariff) stated by Trotter to be $54,124, and by Williamson to be $58,658 (and the jury must determine which is the correct sum), and also deduct from the selling price ten, twenty or thirty per cent., accordingly as they shall find from the evidence the rate proved to be, and, after these deductions, interest at the rate of six per cent. should be cast on and added to the balance from January 1, 1854, to to-day. This will give, as I make it, not very far from $40,000, if the discount is twenty per cent., and a less sum if thirty per cent.

But as I have already remarked, before the jury come to this result, they must be satisfied that the facts proved, warrant them in fixing this sum as the actual damages sustained by the plaintiffs.

And if the jury should not feel satisfied that the actual damage proved amounted to so large a sum, then they will search for the true sum which the evidence proves. This leads me to submit another aspect of the case, and I shall, of course, leave it for them to say whether or not it is on the whole the true one.

Suppose a patentee of a carriage or a machine, which could be easily built by any person who desired to use it, should license a large number of persons to build, each for his own use, a single one, and suppose this was the exclusive mode in which the patentee endeavored or desired to profit by his invention. The price of these licenses of course would be uniform for the same machine or article.

Now, suppose one man should build one without a license, and should be sued for an infringement, what would be the actual damage the patentee must sustain? Clearly, the price at which he uniformly sold his license. The infringer in that case desires the article—he obtains it wrongfully—and, in so doing, actually damages the patentee by depriving him of what rightfully belongs to him.

Now, I agree that the case before us is not exactly parallel to the one supposed—Goodyear was the patentee. This patent, among other rights, secured to him the exclusive privilege of making men's and boy's clothing of vulcanized rubber. The right to this exclusive privilege he sold by license to Trotter, and Trotter sold the same to the plaintiffs. The price of that license to Trotter was $10,000, and five cents on every square yard of rubber cloth made. Trotter sold to the plaintiffs for $25,000, the latter to pay the tariff of course. It would seem that this license was worth that tariff at least, as the defendants were willing, and anxious to manufacture and pay that tariff. The plaintiffs also made it a profitable business at that tariff. It may be fair to presume (and I leave it to the jury whether it is so or not) that these very defendants would have been glad to have

bought a license of the plaintiffs at that rate. But the defendants wrongfully availed themselves of the business without payment to the plaintiffs, the exclusive owners of the privileges, and thereby deprived the latter of what was their just due.

It is for the jury to say whether here are not clearly, actual damages sustained by the plaintiffs. If so, the amount can be exactly determined without groping after a result among theories suspended upon "ifs." The number of yards manufactured by the defendants was 82,693½. Multiplying this number by the rate of the tariff per yard the precise result is easily obtained. But if the jury should be satisfied that this tariff furnishes evidence of what the value of this right, appropriated by the defendants, was, it does not follow that they must regard it as conclusive or as the exclusive evidence of that value.

They are at liberty to take into consideration the fact, if they find it proved, that this was a very profitable business. On this point, the evidence of the plaintiffs is explicit; and, although the defendants say they netted only a small sum on what they manufactured, it must be remembered that the whole expense of commencing a new establishment, and the disadvantage of closing the business, all had to come out of five months' production. It is, perhaps, more wonderful that they did not lose than that they made no more; and it is for the jury to say whether the fact that they did make even a small sum, is not evidence, under the circumstances, that the business was a very profitable one.

The jury may also consider, in this connection, the fact that in addition to the tariff of five cents upon the square yard, the bonus of $25,000 was paid by the plaintiffs for this license over and above the tariff, which constituted a part of the price of the license.

The jury can assume seventeen years as the period which the bonus may cover, as that term is the possible life of the license, and then give it such effect in enhancing the rate per cent. as they think it is entitled to.

If the jury should feel satisfied that this was a profitable business, and that a license to carry it on was worth more than the rate of tariff paid to Goodyear, they may add to the rate such per cent. as will, in their judgment, be warranted by the evidence, and will give, when the rate is multiplied by the whole number of yards manufactured, the actual damages sustained by the plaintiffs.

As I have stated to you, gentlemen, the tariff rate is five cents upon the square yard, and the number of square yards is 82,693½. In addition to that, I have also mentioned the fact that the witnesses for the plaintiffs testify that it was a very profitable business (but you are to judge of that evidence), and that the defendants made, under all their disadvantages, some profit.

In addition to that there is the bonus of $25,-

000, paid by the plaintiffs, for the use of this exclusive privilege, over and above the five cents upon the square yard. Of course, that is evidence, and appropriate evidence, for the jury to consider, in saying what the value of the rights of the plaintiffs was, of which the defendants deprived the plaintiffs and appropriated to themselves.

Of course, to whatever sum they find as the damage accrued at the time the manufacture ceased, July 1, 1853, they will add interest at six per cent. for eight years and a half a month. There is no evidence here when the tariffs were payable, and I take that as most favorable to the defendants. They will, in their verdict, distinguish between the principal sum they find and the interest, so that if there is any error, either in the time or computation, it can be corrected without a new trial.

The jury found a verdict for the plaintiffs, with $7,180.47 damages.

[For other cases involving this patent, see note to Goodyear v. Central R. Co., Case No. 5,563.]